All first case. Case number 15-39. All right. Good morning. Actually, we're back to morning now. Good morning, everyone. Welcome to the Illinois Court, 1st District, 6th Division. We're going to ask the lawyers who are going to argue. Please both step up and tell us who you are and who you represent. Good morning, Your Honors Counsel. My name is Mario Kladis. I'm an Assistant Appellant Defender with the Office of the State Appellant Defender, and I represent the Petitioner Appellant, or the Defendant Appellant, Marcos Macias. Good morning, Your Honors. My name is Mary Haxenbuehler. I'm an Assistant State's Attorney representing the people of the state of Illinois. All right. Thank you, Counsel. Under Supreme Court Rule 352B, each side has 20 minutes for the main argument. Appellant has 10 minutes for rebuttal. We may change that if we have a lot of questions or if the argument becomes repetitive. Please remember to speak loudly because the microphones don't amplify well. They're really here just to record. Please understand we have read the briefs and we're familiar with the facts of the case. So devote your time to your strongest arguments. Also, Justice Cunningham is the third member of the panel. She's unable to be here today, but she will listen to the tape recording the argument and participate in the panel's deliberations. Mr. Kladis, you may proceed when you're ready. Thank you, Your Honors. Mr. Macias was found guilty of two counts of attempted murder of a peace officer and he was sentenced to 55 years in prison. On appeal, we've argued two points. The first, that Mr. Macias was denied his right to the effective assistance of counsel. The second, that this Court should amend the case for resentencing or reduce the sentence due to errors that occur with sentencing. This morning, I'm going to focus on the first allegation of error in the ineffective assistance claim. If the Court has any questions regarding the other claims, I'll do my best to answer them. Your Honors, trial counsel has a duty to explore all readily available evidence that might benefit you in your criminal trial. Counsel has to meet that duty. Counsel has to thoroughly investigate all matters relevant to plausible options. And he fails to meet that duty if he, for example, fails to interview a known available witness whose testimony would exonerate you. And that's especially true if this omission leaves your defense at trial otherwise uncooperated. In this case, Rene Cardona testified at the post-trial motion hearing that he was with Mr. Macias when the shooting occurred. The judge heard Mr. Cardona testify, observed him in court, found his testimony very, very important or very, very significant and that it cooperates everything we know about the case. The Court further found that three months before trial, on December 10, 2012, Cardona came to court and met with an associate of trial counsel David Weiner. The Court found that on this date, Cardona gave this information that cooperates everything to the associate. And we know from the record that nothing happened after that. The associate didn't do anything with the information, and that was it. Trial counsel David Weiner denied any knowledge of this. He claimed that no one told him about Mr. Cardona and that he didn't learn about Mr. Cardona until after the trial from an ARDC complaint. Mr. Kladis, this case comes to us in a little bit of an unusual posture. We get a lot of cases here where a criminal defendant, after being found guilty, raises ineffective assistance to counsel, and then the judge says, man, you're fine, or save it for post-conviction, or you don't have anything here warning you.  Yes, sir. The criminal came in and testified in front of the trial judge. And based on that, the judge denied relief. And given that fact, isn't it appropriate and possible that the judge could have disbelieved all the testimony, that taking the position that the attorney knew about this guy, that all of this was just concocted after the fact, the family never told the attorney about Cardona, and that they were just not telling the truth at the hearing? Isn't that a judgment call that we have to give to the trial court? I don't think the judge found that. The court's ruling, the judge flat out said, I believe this meeting between Mr. Cardona and David Weiner's associate took place on December 10, 2012. The court went through some effort to pin down the exact date, and the record reflects, actually, that on that date, Mr. Weiner was not in court. An attorney named Michael, I believe it's Michael Vahey, the last name is Vahey, was suspected for Weiner. And so presumably that's the person he met with. And everything the judge said at this hearing, nothing in the judge's ruling indicates that the judge disbelieved that Cardona met with this associate. On appeal, I don't believe the state disputes that Cardona met with the associate. The dispute on appeal is whether anybody told Weiner about it or whether Weiner knew about it before trial or during trial. I believe the judge's ruling is pretty clear. He says, I believe this meeting took place on December 10, 2012. Okay. Counsel, let's hone in on the judge's ruling then and describe what your argument is relative to how it seems to take two different sides here. It takes two different sides. Before his ruling, he mentioned that he rejected the, I think he said reputed, but imputed knowledge of Weiner, but at the same time he had some other reasons for it. Yeah. So the court basically did was, so Weiner is asked about this. He testifies in court. I don't know about this guy. I never heard about this guy. And the court, having heard this explanation, then improperly proceeded to make one up or to make several up that Weiner didn't offer when he had the chance. And the court, your argument mentioned his imputing the associate's knowledge to Weiner. On appeal, the state argues that that was proper. If this knowledge is imputed to Weiner, the court implicitly rejected Weiner's explanation that he didn't know about Cardona. The court is holding him accountable for the knowledge, as the court predicted, the knowledge gained by this attorney when he spoke to Cardona in court. So Weiner doesn't explain anything except to say, I didn't know. The court essentially rejects that and then moves on to invent or to construct strategic defenses that Weiner didn't offer. Now, when people view public opinion by this court, the court can't do that. In a case where counsel is called in the court and asked to explain why did you do this thing, if he doesn't explain it or if the court doesn't accept his explanation, the court can't proceed to speculate about why he might have done the things he did, given he's already had the chance to give the court his actual reason for doing or not doing the particular thing in question. So the court couldn't properly construct this defense or these several defenses, and even if the court could, the ones the court came up with don't make sense. I mean, the first thing the court noted was that Cardona doesn't come forward for three years and, you know, after the shooting and three months before trial. And people who oppose this court explain, you know, 24 hours is enough to disclose a witness, so long as the opposing party has some time to ascertain the substance of the witness's testimony before the witness testifies. Three months is plenty of time for the state to do that. And under Posey, the court mentions, you know, the witness, in that case, the court found a logical explanation for the late disclosure. Here we have that. It's undisputed, all Maceius knew about this witness were his initials, RC. That's all the family knew from Mr. Maceius. So all they had to go on was a man named RC. As it turned out, RC is Rene Cardona, and he was in jail for some period of time while the family was looking for him. So there's not just more than enough time for the state to ascertain the substance of his testimony. There's also a logical explanation for the delay in finding him. You know, following up sort of on the same theme of Mr. Cardona, you know, one of the themes that runs through our jurisprudence is that the defense attorney might decide strategically not to call someone because of their rather disagreeable background. I mean, you just mentioned he's in jail. He's, I think, a convicted felon. Yes. And don't we have some deference to owe to the attorney to say, I did talk to the guy, the associate talked to the guy. He's not going to be a good witness. In fact, he might undermine my client and be damaging. So therefore, strategically, I'm not going to call him. The first thing to note about that, Your Honor, is the state presented no evidence that the associate knew anything about Cardona's criminal background. Cardona didn't tell the court. I told him I was a convicted felon. And if the state wanted to show that, they had an opportunity. We had a hearing. The state could have presented evidence if there was any, and apparently there's not. Based on what we know from this hearing, Cardona told the associate what he knew. There's no evidence the associate had any knowledge about his criminal background. And under Strickland, counsel's performance is judged, is evaluated from his perspective at the time he makes a decision. And so here, there's no evidence he knew about Cardona's criminal background. And another thing to note about this, we're talking about a trial in which the defense's strategy is apparently to present Macy's. Macy's himself is a convicted felon. One of the state's key witnesses, Noel De La Luna, is also a convicted felon. In a case like this, where both sides have, I think the judge used the term muddy the waters, let's say the waters are a little muddy on both sides because of this, I don't think counsel can reasonably choose to not corroborate an otherwise uncorroborated defense because the witness has a felony in his record, especially when the jury is going to be told, you don't even have to consider this. He's got a record. You can consider it. You cannot consider it. You're free to give it whatever way you want to give it or not give it. I think in another case, Rana was right. Maybe counsel could reasonably choose this, but given the strategy that's chosen and given the evidence that's presented, I don't think counsel could reasonably choose, again, when counsel doesn't even know, apparently, that he has a conviction in his record, to not even contact him to find out more. Counsel, can I ask you, your opponent argues that there are so many eyewitnesses, the testimony was very strong, it was kind of overwhelming, the evidence. What's your comment to that? My comment to that, Your Honor, is essentially that under Strickland, to show prejudice, the defendant just has to show there's a reasonable probability that the outcome would have been different had these multiple errors in this case not occurred. The trial court below, the State on Appeal, focuses on, well, there's essentially just four eyewitnesses who says that this is the guy. That may be the case, but under Strickland, the defendant just has to show reasonable probability. This court held in Peeple v. Miller, under Strickland, the defendant just has to show that the odds of acquittal, they might be significantly less than 50 percent, but that's enough. In Peeple v. Wilson, this court explained the defendant just has to show a non-negligible chance that the outcome would have been different had these errors not occurred. In Peeple v. White, the only one Supreme Court explained that showing prejudice under Strickland is equivalent to showing prejudice under the first prong of the plain error rule. In Peeple v. Sebi, another non-Supreme Court case from 2017, the Supreme Court explained that once you have a, for the plain error rule, the first prong, once you have clear error in a closely balanced case, you have prejudice, and the defendant is entitled to relief. Sebi further held evidence in a case is closely balanced when both sides present plausible or non-falsifiable accounts and extrinsic evidence doesn't support or contradict either side. And that's what we have here, notwithstanding that Macias was outnumbered at trial. And I have to note a little bit about that. The judge's finding below, the state's argument on appeal, creates a catch-22 for the defendant. It's essentially he can't show prejudice from counsel's error because he was outnumbered 4-1 at trial, but he was outnumbered 4-1 at trial precisely due to that error. But going back to Sebi, in Macias' case, we've got two accounts. Mr. Macias' account is not plausible, is not implausible, it's not falsifiable. You know, there's a shooting. He's arrested down the block. His testimony is, I was down the block when the shooting occurred. There's nothing about that that's implausible or falseful, and on appeal the state doesn't contend that there is. And had counsel bothered to investigate Cardona, counsel could have corroborated this otherwise uncorroborated defense with the testimony of the person Macias apparently sold cocaine to, which is what he testified at trial. He was down the block, he had just sold his last bag of cocaine to someone, and apparently that was Ray Cardona. Also, there was an officer that was called, I think it was in rebuttal, that made a statement that he somehow changed his story as to what his first story was about where he was. Is that true? Is it true that an officer testified that? No, no. That, yeah, the officer just said that he did change his story, and what was the substance of that testimony? The substance of the testimony, if I recall correctly, that Macias, when he stopped, according to this officer, told the officer that he had been running from Ohio Street because gangs were shooting at each other. And the thing is, this is just another thing to consider under SEBI. Again, SEBI says you've got a credibility contest when both sides present plausible accounts and you don't have extrinsic evidence to support or contradict either side. This officer's testimony in rebuttal is another piece of evidence, but it's still going to depend on the credibility of the officer. The jury is not required to believe this, as I believe they were instructed. The state's theory, meanwhile, is implausible. The state's theory at trial is that the shooter, having just engaged in this epic gun battle on Huron, immediately sprints roughly two blocks north and east of the shooting to 720 North Elizabeth Street. The argument was that Macias personally ditched this gun at this address, leaving no prints on it, no DNA, even though he's supposedly sweating when he's apprehended. Nobody sees him there. He then immediately, apparently with no hesitation, given how fast everything happened, sprints straight back to Huron. He's on the north side of Huron, and at this point he crosses to the south side, even though by this time there's almost certainly a police cruiser down the block with officers clothed dressed in camouflage on the side, and they're looking for the shooter that fled the scene. So Macias, according to this theory, crosses to the south side of Huron, then tries to cross back to the north side of Huron, again for no reason that anyone offers to explain. And when we're supposed to, when we're determining prejudice, we apply common sense to the evidence that was presented at trial. And respectfully, this theory the state was in doesn't make any sense. The prosecutors had trouble explaining it at trial. One of them, I think, reasonably said, well, the shooter ran because he knows this place is going to be swarming with police officers like any second now. That's right. The other prosecutor argued, well, he came back because he wanted to see if he was successful in his mission of shooting at these officers. Now, there's no explanation for that. On appeal, the state doesn't try to explain it. The state's not obligated to prove why the shooter would have run back. But when we're analyzing prejudice, the question is, could the jury have reasonably said, you know, I think these witnesses testified sincerely as best as they could, but I don't understand this theory that requires this guy to run back to the, basically to the crime scene when he knows reasonably that there are going to be police officers all over the place. The question is, could the jury hear that and go, I don't find this theory plausible. Could I, the jury could reasonably reject the theory based on this. And that's the question we have to look at when we're analyzing prejudice under SEBI and by extension under Strickland. In terms of the extrinsic evidence that was presented at trial, all we really have is this gunshot residue. There's no DNA on the gun. There's no prints. And the gunshot residue goes both ways. It doesn't support or contradict either side. On the one hand, there's a glove found inside of Macias' hoodie pocket. And I have to note, nobody, nobody testified that Macias was wearing gloves. One of the officers, I believe Officer Vulture, testified that during the shooting, he was looking at the shooter's hands. He saw the shooter holding the firearm with both hands. He did not say anything about gloves. And if he had seen gloves, that would have been a good time to bring that out, given that this glove, and with exactly three GSR particles on it, are the only physical evidence that conceivably connects Macias to the shooting. Another problem with this glove with the three GSR particles is there's no way to connect it to the gun. There's no way to know when they got there. The state didn't present any evidence to explain, well, for example, how long gunshot residue stays on cloth. We know that gunshot residue, from the witness' testimony, can be washed off hands fairly, you know, within some short period of time after firing a weapon. But we don't know anything about how long it stays on cloth. And I have authority in my briefs for the premise that it stays on cloth longer than it stays on a person's hands. And that gets to the other gunshot residue evidence that cuts the opposite way. The state's witnesses testified that when you fire a weapon, gun smoke shoots off the back of the gun four to six feet onto your arms, onto your hands. And the forensics investigator who testified for the state explained that if you fire a weapon while you're wearing a jacket, the most likely place to find gunshot residue is going to be in your jacket cuffs. The state's experts looked at Macias' jacket, which he was wearing, according to the officers, during the shooting when he fired 11 gunshots. There was no gunshot residue on it. The expert testified it was as negative a test as he'd ever seen. In people be wild, the appellate court considered an argument by the defendant. There was a murder. The victim was shot to death. The defendant's claim involved some allegation that the victim had been firing a weapon. I believe he claimed the victim fired five gunshots before he was killed. The appellate court rejected this precisely because there was no gunshot residue on the victim's sleeves when he died. And the court held, look, there's no evidence this guy fired one shot, let alone five. And we have the exact same problem here. They look at his jacket cuffs. This is the most likely place to find GSR. There's none on the jacket cuffs. And again, this is two and a half minutes when they apprehend him. There's no time for the GSR to, I guess, fall off the jacket cuffs in that period when he's apprehended. Counsel, can I interrupt you for one second? Yes. As far as the connection to the, I don't remember if it were shells or, as far as the 11 shots, I mean, how did they know there were 11? Did they see? I believe, if I recall correctly, they found at least 11 shells or shell casings that they connected to the firearm. So it was connected to that firearm? Yes, I believe so. We don't dispute that there was a shooting. We don't dispute the state's evidence connecting the gun that was recovered to the shooting. So ultimately what we have under SEBI is two accounts. Let's just say that the state's theory is plausible. We dispute that, but let's say it is. We've got two plausible accounts. We don't have extrinsic evidence that conclusively cuts either way. If anything, the extrinsic evidence of no gunshot residue on Macy's sleeves, I think, is a little more convincing than this glove that nobody saw him wearing being found in his pocket that has the bare minimum particles you can even have for a positive result. You're getting close to your deadline. Yes. So under SEBI, you've got a closely balanced case. We've got clear error. We've got a closely balanced case. Under SEBI, and by extension, Strickland, that's prejudice. The defendant is entitled to relief in that scenario. So we ask your honors to reverse Mr. Macy's convictions and order a new trial because he was denied the effective assistance of counsel. Thank you. All right. Thank you, counsel. Ms. Hodgson, you'll need to proceed when you're ready. Thank you. Good morning again. This was not a closely balanced case by any stretch of the imagination. You have to look at what happened during this shooting. These police officers are walking across the street, and they walk across the street, and this defendant is behind the parked car, and they see the defendant rapidly. Somebody who they know. These officers have had contact with the defendant before. They know the defendant. These officers' testimony was consistent. The defendant was the person who rapidly shot at them. He was the person who flanked them, tried to go after them as the officers sought cover. This is overwhelming evidence that the defendant is the one who was the shooting. But the officer's testimony was corroborated by Noel DeLeon. At 145 in the morning, he was getting out of his mother's car. He gets out of the car, and the defendant approaches him and says, Your brother's bogus. He owes me $70. And Noel says, Don't give my brother drugs on credit. What are you going to do if my brother doesn't pay you? At that point, the defendant lifts up his shirt, shows the gun, and takes the gun out. And then he says, Hold on. And they both look, and Noel saw that those were police officers who were approaching the defendant to conduct a field interview. At that time, the defendant rapidly shot at the officers. But in addition to Noel's testimony, you have Claudia. Claudia was Daniel DeLeon's girlfriend. She was in Noel DeLeon's mom's house. She heard the car drive out at 145. She looked outside, and she saw the defendant and Noel standing behind the car. Just like Noel said, just like the officers testified to. Also, Daisy saw the defendant prior to when he came to the house demanding the drug money. So we have four very, very credible witnesses who testified against the defendant. There was no doubt in their minds that the defendant was the one who rapidly fired. Overwhelming evidence. The defendant's testimony was not credible. The defendant said, I was alone. And after he heard the gunshots, he ducked down and walked a couple steps. Well, he walked a couple steps. The officer's a resident. But he was sweating profusely, breathing heavily. Just doesn't make sense. The defendant also said he saw nothing. Nothing out there. He was just a block away. But this is a very concentrated area. The blocks aren't regular city blocks. They're half blocks. So where the gun was located and where the defendant was is about .2 miles. It doesn't take a long time to hide a gun somewhere and then run back. And you're sweating profusely, breathing heavily. With regard to Rene Cardona. Rene Cardona's proposed testimony and what Judge Gaynor said, he said look at it closely. Because it supports the state's position. Because Cardona testified, he saw two people walking in the street. He saw three people standing behind the car. He saw one of the people behind the car shooting. He heard the gunshots. He said he was with defendants. This, Rene Cardona's testimony would have directly contradicted the defendant's testimony that he was alone. And he didn't see anything at the time. Counsel, let's talk about the attorney. No, let's first talk about the trial's ruling. Can you explain to me the basis of the trial court's ruling and how it makes sense? Well, Your Honor, I've read that ruling many, many times. And I think that Judge Gaynor was looking at the evidence. And when he was finding Rene Cardona, that he supported the state. He didn't say that he was credible. He said that he supported the state. And these are the different things that Rene Cardona believed. But the defendant was represented not only by Mr. Wiener, but he had a legal team representing him. And it's not uncommon for associates to be in court at different times. And Mr. Wiener testified that he didn't remember. Remember, this hearing was five years after he had been retained to about a year and a half after the trial. Many clients forget, doesn't remember. And if he had remembered, or if his associates had been told about this hour by witness, they would have told him. But what's also interesting is, in Rene Cardona's testimony during the March Infirmary trial, he said that he knew the defendant had been arrested after he'd been arrested. Well, if he knew the defendant had been arrested and he was with the defendant, wouldn't you think at that point he would have told the authorities or would have gone to somebody or contacted somebody? Let's talk about the lawyer again, the lawyer. He said he didn't remember. That's his testimony. I do not remember. I don't remember. And he said, had he? Had he remembered? And then the court imputed knowledge to him that allegedly one of his associates got. Right, right. So which is it? Well, I think that you have to look at both of the things that Mr. Wiener said he didn't remember and that then the testimony was that they told the associates. And then he testified that if the associates told me, I would have interviewed the witnesses. Well, how about the other thing that Mr. Wiener didn't remember, two really important things to a defendant? A witness that maybe should be brought forward. And also whether or not he, the issue of his testimony, the defendant giving testimony. He said, I don't really remember what happened. I told him it would be the best thing in trial strategy, but I don't know if he said yes or no. And I told him. Isn't that interesting? Well, I will also say that prior to the defendant testifying, Judge Wiener said to the defendant, you're voluntarily doing this. Nobody's threatening you. Nobody's telling you to do this. So the defendant voluntarily testified. But for the lawyer, his testimony, what did he say about the defendant testifying? Well, he said that he knew at all times that the defendant, he believed the defendant. This is what's interesting. He believed the defendant when he said that he was alone, that he wasn't the shooter. But what was his advice? What did he say to the defendant? His advice was, I suggest that you, he recommended that he testify because he had explained with the two police officers, he had two police officers testifying against him. And so Mr. Wiener's testimony was that he encouraged the defendant to testify because he believed the testimony of the defendant that he was alone and that he didn't do the shooting. But then you have the proposed testimony of Rene Cardona saying that he was with the defendant, so it was negating that he was alone, and that Cardona was able to see everything that was going on a half a block away, but the defendant didn't. So it didn't make sense. It just, Cardona's testimony was different. I'll put it this way. So now the court says that it was imputed to the judge, imputed to the lawyer. So as far as your trial strategy, I'm going to represent this guy. I've got a guy that's telling me he was there and he didn't do any shooting. Right. How is that good trial strategy to ignore that, what might benefit the defendant in a trial? But it's not going to benefit the defendant because he heard the testimony of Cardona saying that he was with the defendant, contradicting what the defendant testified to at trial. Defendant testified that he was alone and that the shooting occurred. He ducked down and within seconds he was arrested. And what did the defendant say about why he testified at trial? Well, then he tried to say that his attorney told him to testify and that he didn't do it voluntarily. However, immediately before he testified, Judge Gaynor asked him, are you testifying? Is this voluntary? So now the defendant's admitting, well, I committed murder, then at trial. Well, you know what? He can't have it both ways. He was advised by his, he was encouraged by his attorney to testify. Is that the testimony, I encouraged him, the lawyer? He didn't use the words encouraged. He said that he recommended, perhaps, the language, something similar to that, because he believed the defendant. But you have to, this is just one part of the whole trial. And if you look at the entire record in this case, Mr. Gaynor. I'm looking at the attorney's conduct. And that's what I'm getting to, Your Honor, that this attorney was a vigorous advocate on behalf of the defendant. A counsel. How can you possibly say he was vigorous? He visited me once. Pardon me? In the bullpen. No, he didn't say once in the bullpen. He said several times. He talked to the defendant six times, six times about his testimony, about his, the trial strategy. He had visits, face-to-face. Face-to-face visits, but he had associates. He had a legal team that was working. The legal team, we all know, we work, you collaborate with other attorneys in your office. Women working on cases. And he had been with these other attorneys for many, many years. And can we take judicial notice of the fact that he was, I don't know, either censured, suspended, whatever, by the ARDC relative to his performance in criminal cases? Well, it's not relevant in this case because at the time that Mr. Weiner represented the defendant, he was not under investigation. He had not been suspended. So case law has been that it's determined that this attorney adequately represented him. But there was a complaint filed against him at the time. After. That's how he found out. Yes. After trial. That he had been filed with the ARDC. Yes. But it didn't, at this point, he was, if he was under investigation, there were no, nothing was, no charges had been brought as regard to this case except for after trial. But there was no suspension pending. There was nothing pending at the time of this trial. I understand. But looking at the whole record, competent, coherent, open argument. He cross-examined the officers about what they saw, how far away they were, how far away they were. Did he cross-examine the expert on the GSR? He cross-examined the expert on the GSR. Did he ask why, you know, the threshold level of three? Right. And did he ask about that at all? That's the lowest, you know, that can be. Well, he did talk about that with regard to the hand. It had the one trial component. But it was also in the vicinity of the particles. And the cuff came back negative. But it's interesting. It's very possible the cuff came back negative because the glove was covering the cuff. But there was nothing on him other than those things on the glove. That's it. The three in the glove, that was in his hoodie. All right. And the one on his hand. And it was inconclusive, which almost is in defense of the defendant. Because if it was inconclusive there, then that means that maybe he didn't have a gun in that hand. But I also find it very disingenuous that the officers didn't testify that there was a glove. You're 12 feet away from somebody, and they're rapidly firing at you. You see the gun. You see the flash. Because there were 11 shots. 11 shots.  And minimal GSR. Minimal. Well, minimal, there was three on the glove. But remember, let's look at the indictment there. You're exactly right. But also the officer had, he took the glove from him right away. No. So it was not right away. When I reviewed the record, what occurred, Your Honor, is that after he was arrested and the handcuffs were placed on him, he was placed in the car, and they recovered the glove possibly, I'm going to say between 10 minutes and a little while, because they recovered it after the show up. And it was a different investigator. And it was a different investigator who recovered it. There were two officers who testified sort of that they recovered it, but it was Investigator Ryan who did recover it. So who recovered it? Do we know? Investigator Ryan, because then he said he took it out to make sure that it was inventory and that it would be used. So he took it from the defendant? That it was recovered from the defendant's hoodie. So while he was in the car, in the squad, he had the glove still with him? In, from my review of the evidence in preparation for the judgment. Did the officers testify differently? They both testified that they recovered it. And maybe the officer arrested him, said he recovered it, but kept it there to be recovered by the analyst. But also remember with GSR, the environment plays a big role. And this was an outside shooting. This was in the winter. So it's very possible that the, and what Mr. Burke testified, Investigator Burke testified, that there are environmental factors. The way the wind blows, the way things are in the environment. So that could have an effect on the GSR. But there's no testimony to that effect? Well, he did testify being in the environment. And he did testify that he analogized the GSR with smoking a cigarette and how the smoke goes in different places, the three to four feet. Counsel, why didn't the defense counsel suggest IPI 3.14? Is this trial tactic of some kind? Well, our position is that, first of all, it is our position that it was trial tactic. But also with regard to the IPI, the evidence in this case was that the defendant was, he had to say that it was a drug deal. Otherwise, why was he in the neighborhood? A neighborhood that he didn't leave in. He was at the DeLone house trying to get the drug debt. He was talking to Noel DeLone about the drugs. And this evidence was in the area to collect the money for drugs. He said it was part of this continuing narrative of what occurred at this time. But the reason that our position would be that Mr. Wiener did not submit that is because he didn't want to highlight this drug evidence. This was just part and parcel of the continuing narrative of what occurred. But he asked him. He asked him on his direct, did he not? He asked the defendant. Yes. But that had already been brought up during the people's case in chief when you had him going to collect the drug debt, telling the drug addict's brother that he was there to collect the drug debt. Well, then why wouldn't you offer that instruction? Because I think that he, I believe that he did not want to highlight that this drug, this drug evidence. They didn't want to say it was a bad act. It wasn't a prior crime. They wanted to focus on just what was, they wanted to look at the other evidence that who beyond a reasonable doubt. But the jury heard all of this. They heard all of it. And wouldn't it try to help your client to say the propensity? No. In the non-limited instruction whatsoever. No. But I think that a limited instruction is not required when the evidence of bad acts is part of the continuing narrative. It's not required. But is that what a good lawyer does? I think in this case it was a good trial strategy not to do it. No. That was a good trial strategy. Because he didn't want to highlight that the defendant was in, that this was the sole thing that defendant was engaged, that this was, that he was a bad person. I don't think he wanted to highlight it for the jury to hear. I believe it was a sound trial strategy. You look at the entire record. These are just little pieces that are put together. But if you look at everything, and he crosses him and the witnesses. He gave a closing argument. He gave a very good closing argument. He presented the defendant. The defendant was able to testify to what he wanted to testify, what he believed occurred. But if you look at the evidence, it's overwhelmingly established this defendant's guilt. Counsel, let me ask you one more question. Strickland says that only after there's been a thorough investigation of all matters relevant to possible options available, after a thorough investigation, do you think this attorney conducted a thorough investigation into every avenue in this case? He testified that he read all the police reports. He looked at all the transcripts. He looked at the testimony. As far as this witness. As far as Mr. Cardona. Yeah. Who came three years after. I understand the facts. For three years. I understand the facts. I know you do, Your Honor. And what I'm just saying is that I do believe that he investigated the best that he knew, given the fact that he didn't recall all of it. And that this is, again, five years. People's memories fade. But he did, if you look at the trial record, he was a strong advocate on behalf of the defendant. And, again, overwhelming evidence of his guilt. If you have no further questions, we ask that you affirm his conviction and his sentence. Thank you. Thank you, counsel. Mr. Plattis. Thank you, Your Honors. I'm very bad at gauging how long I'm up here while I'm talking. So I'm going to try to address a few things as briefly as I can. Fundamentally, this is a closely balanced case. People he said he demonstrates this. The state doesn't respond to it when it's brief. It doesn't respond to it now. The state's argument is, again, well, it's basically four on one. The law is clear that this is not a numbers game. It can't be a numbers game. And you can see this from cases where the defendant challenges the sufficiency of the evidence. It's just a gross. You kind of have a harmful fact in here, don't you, that the officers actually knew this guy and recognized him. They knew him. But ultimately, whether the jury can find him guilty depends on whether the jury finds these witnesses credible. It's a credibility contest. Under SEBI, if it's a credibility contest, and that just means both sides present plausible or nonfluenceful accounts, the extrinsic evidence doesn't support or contradict either side, errors in those cases are prejudicial. That's all the defendant has to show here. The state doesn't address that statement in its brief. It doesn't address it here in this courtroom. What's your response to the state's point that, you know, here's how it plays out, okay? You've got the defendant testifying, and you need to explain why he was there. So the defense attorney puts that on the table. You know, he was there to do a drug deal. And you sort of want that to fleet by, and maybe the jurors won't hear it or they forget about it. But then you plot this gigantic official instruction in front of them that says, don't pay no attention to the testimony that he was doing, a drug deal. And then the state's position is that then that highlights it, and it might be a decent strategy to just let that go by and hope for the best. I think if that were the only evidence in the case that the defendant had a fleeting reference to a drug deal when he testified on direct exam, maybe. But that's not what happened here. The record is littered, the trial record is littered with references to Macy's being a drug dealer, going to the house early in the day to collect money for drugs, selling drugs right before the shooting, supposedly threatening Noel De Leon over drug money. Macy's himself in cross-exam testified that he had been selling drugs to Daniel De Leon for years. So this isn't even a case where the crime is closely connected in time and space to the charged crime. We're talking about unspecified crimes that have been going on, according to the defendant in cross-exam, for years. When we get to closing argument, the prosecutors made very sure that the jurors knew Macy's was a drug dealer, repeatedly mentioning that he was in the neighborhood to collect a drug debt to get drug money. He was selling drugs. By the end of closing argument, even if counsel was thinking, oh, you know, I don't want the jury to focus on all these references to drugs, so I'm not going to, you know, add it, I'm not going to argue anything, I'm not going to ask for an instruction. By the time closing argument is over, counsel knows what's going on, and counsel knows the jury is thinking, okay, this guy is a drug dealer. And again, counsel's entire strategy at trial was to concede that Macy's was a drug dealer, presumably as some attempt to maintain credibility with the jury. That's not unreasonable. We get into unreasonable territory when, having all this evidence presented, counsel fails to request an instruction that has literally no downside. There's no question the jurors know he's a drug dealer. There's no question they're going to think about it. The state made sure of it. All you do is make sure that when the jury considers this thing you know they're going to consider, they only consider it for proper purposes. Counsel failed to do that. A reasonable attorney does not fail to do that. Your Honor, if we're asking how to make sense of a court's ruling on a motion-free trial, one way to read the court's order is the court threw up its hands and said, I'm not sure what to do about the error here. I've got a witness whose testimony corroborates everything. I find that he met with somebody three months before trial. I'm going to invent some reasons why someone might have called him. And then eventually the court says, but you know what's really important here is the defendant can't show prejudice. And why can't he show prejudice? Essentially because it's four-on-one. And I come back to the catch-22 we have here. The court is finding he can't show prejudice from counsel's failure to investigate this witness and to present him at trial, precisely because counsel failed to do it. In terms of, you know, what Wiener told counsel or told Macy's about testifying, whether Wiener, you know, there's a lot on the record. You know, Macy has claimed he told counsel. Wiener says, well, he told me he was alone. It doesn't even matter. From counsel's perspective, at the time he has to decide whether to follow up this Rene Cardona three months before trial, it doesn't even matter if his client has told him he was alone. What he knows is I've got this witness coming in whose information corroborates everything I know about the case, and it's unequivocally exculpatory. The people who came to this court held that when a witness comes forward whose testimony is unequivocally exculpatory, counsel can't reasonably do nothing with that information. And that's what we have here. Counsel knows this, he hears this information, even if his client just said, oh, you know, I was alone. From your perspective at the time, you don't know why your client, your client might have some obvious reasons why he's not telling you about this person he sold drugs to right before the crime. I can speculate about what those reasons might be, but what's not speculation is your duty to the client in that scenario. You have to thoroughly investigate all matters relevant to plausible options. Calling this witness at trial is a plausible option. That doesn't mean you have to do it, but you have to thoroughly investigate it. But he didn't do it. Either he didn't do it, his associate didn't do it, someone dropped the ball. On appeal, the state contends that it's proper to repute that knowledge to Attorney Weiner. Fine. Let's say that Weiner was told Macy's was alone. Fine. From counsel's perspective at the time he meets with Cardona, he cannot just disregard this. Not in a case where his plan is to present an otherwise uncooperated defense. And finally, just in terms of the gunshot residue, well, actually, in terms of the pattern instruction, the limiting instruction, sorry, just, oh, yeah, sorry, the gunshot residue, sorry, your honors. You know, Cole G.S.V. did say, I recovered the glove. Presumably, I don't know what recovered could mean except to touch it, to take it out of the defendant's pocket while you are frisking him during this arrest. In terms of what Burke testified about environmental conditions, I just want to make clear, Burke did not testify to the environmental conditions that night. In theory, environmental conditions can play a role in this thing. The state presented no evidence that any environmental conditions that were present that night would have affected anything. And certainly not to the extent that it would wipe out gunshot residue from the sleeves of a person who supposedly just fired at least 11 gunshots two and a half minutes before he was arrested in the clothes he wore while firing those gunshots. Under SEBI, this is a closely balanced case. We've got multiple clear errors here. The question on appeal, is there a non-negligible chance that the jury's verdict resulted from these multiple errors and not from the evidence? That's all he has to show. We've got clear errors. We've got closely balanced evidence. Under SEBI, under Strickland, the defendant is entitled to a new trial because his attorney was ineffective. And if there aren't any other questions for me, I'm happy to... I think we're set. Thank you very much, counsel, for your arguments. The court will take the matter under advisement. And that being the only case on the docket today, the court will stand and recess.